418 P.2d 206

Donald BYINGTON and Eugene Byington,
Plaintiffs-Respondents,

v.

CLOVER CLUB POTATO & PRODUCE
COMPANY, an Idaho corporation,
Defendant-Appellant.

No. 9536.

Supreme Court of Idaho.

Sept. 21, 1966.

Hansen & Hansen, Idaho Falls, for appellant.

Petersen, Moss & Olsen, Idaho Falls, for respondents.

SMITH, Justice.

Appellant appeals from a $6,579.40 judgment entered against it in respondents' favor as damages for breach of a contract for the sale and purchase of a crop of potatoes; it also appeals from orders denying its motions for judgment notwithstanding the verdict and for a new trial.

March 4, 1961, appellant, through its agent Ray DeRoche, manager of its warehouse at Cotton Siding, Idaho, entered into a written contract whereby respondents agreed to grow approximately 50 acres of Kennebec potatoes and appellant agreed to buy "all lots of potatoes from this acreage graded not less than 85% U.S. #1, with the balance of 15% graded U.S. #2 or better, two inch minimum," appellant to pay for the potatoes in accordance with the following schedule:

"$1.40 per CWT out of field at harvest time.
  1.50  "   "   Out of Growers Storage up to November 15, 1961.
  1.55  "   "   From November 15, 1961 to January 1, 1962.
  1.60  "   "   From January 1, 1962 to February 1, 1962.
  1.65  "   "   From February 1, 1962 to March 1, 1962.
  1.70  "   "   From March 1, 1962 until April 1, 1962—
                     All spuds to be run by 4/1/62."

Respondents agreed to purchase the seed potatoes to be approved by the parties; also to store the potatoes until April 1, 1962. The contract then provided: "Potatoes will be graded and run by Clover Club Potato & Produce Company. If Grower [respondents] has his own crew, an allowance of $.20 per cwt. will be paid him for sorting."

During a meeting subsequent to the signing of the contract, Mr. DeRoche promised respondents that appellant would begin grading and sorting the potatoes immediately if, while in storage, they showed any indication of deterioration. The evidence is in sharp conflict as to whether Mr. DeRoche further promised that appellant would take all potatoes which met the federal standard for U.S. No. 2 or better.

Thereafter, respondents acquired from appellant 997 cwt. (hundred weight) of Kennebec seed at $3.50 per cwt. if paid for within 30 days after purchase; or at $4.00 per cwt. if not so paid for.

Respondents planted the crop during the growing season of 1961. Because this was their first experience with Kennebec potatoes, respondents maintained a close contact with appellant throughout the summer to see that the proper care was taken of the crop; i. e., irrigation, cutting and rolling the vines, and digging the crop. During the first part of October, 1961, the potatoes were harvested and placed into respondents' potato cellar. At that time the potatoes appeared to be in good condition.

Sometime during the middle part of November 1961 respondents measured the pile of potatoes and cut into a few of them. They determined that the pile consisted of 10,200 cwt.; 75% of which were U.S. No. 2's or better.

November 25, 1961, respondent Donald Byington observed a wet spot developing at the top of the pile about 20 to 25 feet from the back of the cellar. He immediately telephoned Mr. DeRoche who came to the cellar and inspected the potatoes. He advised said respondent "that there was nothing to be concerned about at that time," but

to continue to check the pile and notify him if the spot started enlarging. Some five days later respondent Eugene Byington telephoned Mr. DeRoche and he again came to the cellar. After examining the potatoes, he concluded that they should be immediately removed from the cellar. He further advised respondent that the cellar temperature, which had been kept at about 35°, should be raised to above 40° and kept there in order to increase the starch content of the potatoes before they were moved. Respondents thereupon placed a "salamander" (heating stove) in the cellar and raised the temperature to 42° or 43° and kept it at this level until February, 1962, when appellant advised them that no further attempts to grade and run the potatoes would be made.

On or about December 4, 1961, appellant moved its crew (consisting of 5 to 7 men) into respondents' cellar and began "running" the potatoes. At the end of three days, some 800 sacks, composite pack —U.S. No. 1's and 2's packed together in the same sack, were run before operations ceased because of lack of room to continue work. Appellant's workers departed, leaving the sacked potatoes and did not return until sometime after Christmas during the latter part of December. During that period respondent Eugene Byington called appellant on several occasions urging it to resume operations. Subsequently the sacked potatoes were inspected during the last part of December 1961 or forepart of January 1962 and rejected because of "external defects." As a result of the rejection Mr. DeRoche contacted respondents and told them that the potatoes were rejected because they were "too dirty" and sought permission to "wet run" the potatoes. The same potatoes were again run and sacked during a 5 to 7 days period during the forepart of January. The work crew was again removed and the potatoes remained for some two weeks before they were inspected on January 27, 1962. All but 116 sacks were rejected because of "external defects." On that occasion several of the potatoes cut

into showed no notable internal discoloration.

During the forepart of February, the rejected potatoes and several truck loads from the pile were taken to appellant's warehouse at Cotton Siding. By that time sunken spots in the top of the pile were noticeable; water was oozing out of the pile to the extent that a pump had to be placed in the cellar, and spoilage odor was prevalent. Mr. DeRoche testified that appellant had found "it was impossible to run any portion of these potatoes"; that if respondents could "run them" and "could get them into grade," appellant would buy them, but that appellant was "going to give up on them." Respondents' several attempts to sell the potatoes to other sources were unsuccessful. One man trucked some potatoes for "feed" and promised to pay anything over trucking expenses; respondents received nothing from him. On April 4, 1962, respondents had the remaining potatoes inspected when it was determined that 31% of them were U.S. No. 1's, 31% were No. 2's and the remainder were "culls." Eventually some of the potatoes were sold for "culls" for which respondents received $200.

Respondents filed their complaint alleging breach of contract on the part of appellant for its failure to "run and grade" the potatoes pursuant to the contract. Appellant admitted the contract but denied the breach thereof, and counterclaimed for the price of the Kennebec potato seed.

At the trial by jury, although not pleading modification of the contract, respondents introduced evidence to show that the written agreement had been modified to the extent that appellant would take all of respondents' potatoes which graded U.S. No. 2 or better and that the potatoes would be "run" at the first sign of deterioration.

At the close of all of the evidence, appellant moved for a directed verdict which the court denied. The jury returned a verdict in the amount of $6,579.40 for respondents, followed by entry of judgment thereon. Appellant then moved for judgment notwithstanding the verdict and for a new trial, contending that the evidence was insufficient to support the verdict, which motions the court denied. Appellant has appealed from the judgment and from the orders denying the motion for judgment notwithstanding the verdict and for a new trial.

Appellant, in its argument, states that it denies respondents' allegations that the contract was modified by subsequent oral agreement. The jury resolved that issue in favor of respondents. Appellant's brief does not "contain a distinct enumeration" of any assignment of alleged error so committed, nor citation of authority or argument thereon, thus rendering unnecessary review on appeal in the premises. Supreme Court Rule 41; Fish v. Fleishman, 87 Idaho 126, 391 P.2d 344 (1964); Batchelder v. City of Coeur D'Alene, 85 Idaho 90, 375 P.2d 1001 (1962); Jewett v. Williams, 84 Idaho 93, 369 P.2d 590 (1962); Wurm v. Pulice, 82 Idaho 359, 353 P.2d 1071 (1960).

Appellant assigns error of the trial court in denying the motions for directed verdict, judgment notwithstanding the verdict, and for a new trial. No issue is raised on the appeal relative to appellant's counterclaim for the price of the seed potatoes delivered to respondents.

The sole issue raised by the assignments is whether the evidence is sufficient to sustain the amount of the damages awarded by the jury. In that regard appellant urges insufficiency of the evidence to show the quantity of potatoes in respondents' cellar which met the contract requirements at the time appellant was obligated by the contract to take the potatoes but failed to do so. On the other hand, respondents contend that the evidence supports a finding by the jury that there were more than enough potatoes in the cellar, which appellant was obligated under the contract to purchase, to support the amount of $6,579.40 damages awarded.

Appellant further contends that even though the contract was modified by subsequent oral agreement to provide, (1) that

appellant would purchase all of respondents' potatoes which graded U.S. No. 2 or better, which modified the provision that appellant would purchase all of the potatoes which graded 85% U.S. No. 1, with the balance of 15% U.S. No. 2A or better, and (2) that appellant would "take care of" respondents' potatoes "if they showed any signs of deterioration," which modified the contract provision that all the potatoes were to be run by April 1, 1962; that nevertheless the evidence is insufficient to show the amount of respondents' potatoes which would grade No. 2 or better, at the time appellant was obligated under the contract to take the potatoes.

■■■ The party moving for a directed verdict or judgment notwithstanding the verdict admits the truth of his adversary's evidence and every inference of fact which may be drawn therefrom. Loomis v. Hannah, 89 Idaho 358, 404 P.2d 568 (1965); Foster v. Thomas, 85 Idaho 565, 382 P.2d 792 (1963); Conklin v. Patterson, 85 Idaho 331, 379 P.2d 428 (1963), Shaffer v. Adams, 85 Idaho 258, 378 P.2d 816 (1963); Smith v. Big Lost River Irrigation District, 83 Idaho 374, 364 P.2d 146 (1961); White v. Doney, 82 Idaho 217, 351 P.2d 380 (1960). In view of such rule we shall consider the evidence most favorable to respondents. Loomis v. Hannah, supra; Kelley v. Bruch, 91 Idaho 50, 415 P.2d 693 (1966).

■ Appellant contends that the evidence does not disclose the condition and grade of the potatoes at the time the "running" of the same began December 4, 1961. We are of the view that the evidence—it being substantial, though conflicting—and the reasonable inferences of fact to be drawn therefrom in respondents' favor do not sustain such contention.

Respondent Eugene Byington had been a potato farmer for 12 years and respondent Donald Byington had raised potatoes for some 9 or 10 years. During the middle of November 1961, respondents measured the quantity of potatoes in the cellar for the purpose of determining their financial standing. At that time they figured that the pile contained 10,200 cwt. of potatoes. They inspected samples taken from different parts of the pile. All of the potatoes which had knots, bruises and cuts and which were green or skinned, they placed to one side as culls. Donald Byington then stated that if he thought something was wrong with a potato, he would cut it open and, although he "didn't cut open very many," he noted no internal discoloration. He then testified that respondents determined that 85%, or a good 75%, of the potatoes were "ones and twos," although very few of them would be No. 2's "because they was all big, smooth spuds."

Donald Byington further testified that during November and December 1961 respondents inspected the potatoes on "several occasions" and that they and Seth Carpenter, an employee, ate "a lot of these potatoes and they all seemed in firm condition," and showed no internal discoloration; they were in "firm condition" and there was "nothing wrong" with them. The record further shows that there was little change in the potatoes from the time of the first inspection until the last part of December 1961 when "the potatoes started showing more moisture."

A federal and state inspector of potatoes testified that when he inspected the potatoes on January 27, 1962, internal discoloration or defects had not become a problem—not sufficient "to turn these potatoes down on that basis."

■ The evidence aforesaid establishes the condition and the quality of the potatoes during the month of December 1961. The contract provided that appellant would pay $1.55 per cwt. for potatoes taken during this time period. We therefore, conclude that there is sufficient competent evidence to sustain the jury's award of damages of $6,579.40.

■ A verdict and judgment, supported by substantial, though conflicting, evidence will not be disturbed on appeal. I.C. § 13–219; Robinson v. White, 90 Idaho 548, 414 P.2d 666 (1966); Curzon v. Wells Cargo, Inc., 86 Idaho 38, 382 P.2d 906 (1963);

Eckman v. Jones, 85 Idaho 10, 375 P.2d 180 (1962); Dawson v. Eldredge, 84 Idaho 331, 372 P.2d 414 (1962).

The judgment is affirmed. Costs to respondents.

McFADDEN, C. J., McQUADE and TAYLOR, JJ., and OLIVER, District Judge, concur.